## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LINDA GALE HALL,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:22cv00013 |
| v. | ) | |
| | ) | **REPORT AND** |
| **KILOLO KIJAKAZI,** | ) | **RECOMMENDATION** |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | By:  PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |
| | ) | |

*I. Background and Standard of Review*

Plaintiff, Linda Gale Hall, ("Hall"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). Neither party has requested oral argument. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hall protectively filed her application for DIB on June 19, 2013,[1] alleging disability as of September 21, 2012, based on osteoarthritis; herniated disc; carpal tunnel syndrome; depression; fibromyalgia; and difficulty walking due to swelling of her right foot. (Record, ("R."), at 42, 253-54, 272, 304.) The claim was denied initially and upon reconsideration. (R. at 171-89.) Hall then requested a hearing before an administrative law judge, ("ALJ"). (R. at 190-91.) The ALJ held a hearing on March 21, 2016, at which Hall was represented by counsel. (R. at 86-115.)

By decision dated August 23, 2016, the ALJ denied Hall's claim. (R. at 42-59.) After the ALJ issued his decision, Hall pursued her administrative appeals. (R. at 250-51), but the Appeals Council denied her request for review. (R. at 880-86.) Hall then filed an action in this court seeking review of the ALJ's unfavorable decision. *See Linda Gale Hall v. Nancy A. Berryhill,* Civil Action No. 2:17cv00030. By order dated March 7, 2019, this court vacated the Commissioner's decision and remanded Hall's case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with the

---

[1] Hall previously filed applications for DIB and supplemental security income, ("SSI"), on September 23, 2010, alleging disability as of September 9, 2010. (R. at 42, 122.) By decision dated September 20, 2012, the ALJ denied Hall's claims. (R. at 42, 122-31.) Hall requested review by the Appeals Council, but the Appeals Council denied her request for review. (R. at 133-35.) Therefore, the ALJ's September 20, 2012, decision was the final decision of the Commissioner.

Report and Recommendation issued on February 12, 2019.[2] (R. at 888-901.) By order dated June 14, 2019, the Appeals Council vacated the final decision of the Commissioner and remanded Hall's claim to the ALJ for further proceedings. (R. at 902-05.) Upon remand, the ALJ held supplemental hearings on January 16, 2019, and April 26, 2021, at which Hall was again represented by counsel. (R. at 807-56.)

By decision dated May 25, 2021, the ALJ denied Hall's claim. (R. at 776-95.) The ALJ found that Hall met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2016.[3] (R. at 778.) The ALJ found that Hall had engaged in substantial gainful activity during July 2014 through September 2014, but that there had been a continuous 12-month period during which she did not engage in substantial gainful activity. (R. at 778-79.) The ALJ found that the medical evidence established that, through the date last insured, Hall had severe impairments, namely cervical and lumbar degenerative disc disease; carpal tunnel syndrome; chronic obstructive pulmonary disease, ("COPD"); residuals of lung cancer; osteoarthritis; right shoulder degenerative joint disease/rotator cuff tear; and left pelvic fracture, but he found that Hall did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 779, 782.) The ALJ found that, through the date last insured, Hall had the

---

[2] While Hall's claim was pending before this court, she filed another DIB claim, which was denied by decision dated April 23, 2019. (R. at 910-22.) Upon appeal, the Appeals Council vacated the decision and ordered the ALJ to consolidate Hall's claims, offer a new hearing and issue a new decision. (R. at 776, 904-05, 954-56.)

[3] Hall must show that she became disabled between September 21, 2012, her alleged disability onset date, and September 30, 2016, her date last insured, to be eligible for benefits.

residual functional capacity to perform sedentary[4] work that required no more than occasional performance of postural activities and overhead activities; that required no more than frequent reaching, handling and fingering; that required no more than occasional use of foot controls; and that did not require her to work around pulmonary irritants and industrial hazards. (R. at 784.) The ALJ found that Hall was unable to perform her past relevant work. (R. at 793.) Based on Hall's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that, through the date last insured, a significant number of other jobs existed in the national economy that Hall could perform, including jobs as a document preparer, an inspector/grader and a food checker. (R. at 793-94, 852-53.) Thus, the ALJ concluded that, through the date last insured, Hall was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 795.) *See* 20 C.F.R. § 404.1520(g) (2022).

After the ALJ issued his decision, Hall pursued her administrative appeals, (R. at 1120-21), but the Appeals Council denied her request for review. (R. at 767-71.) Hall then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2022). This case is before this court on Hall's motion for summary judgment filed February 10, 2023, and the Commissioner's motion for summary judgment filed April 12, 2023.

---

[4] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2022).

## II. Facts[5]

Hall was born in 1966, (R. at 89, 253), which classified her as a "younger person" during the time period at issue under 20 C.F.R. § 404.1563(c). Almost two months after her date last insured, Hall turned 50, and she qualified as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). Hall testified that she had an eighth-grade education[6] and past work experience as a certified nursing assistant, ("CNA"), and a companion. (R. at 810-11, 830.) She stated she was unable to work due to residuals from lung cancer, carpal tunnel syndrome, rotator cuff tear of the right shoulder and chronic pain. (R. at 812.) Hall stated she had difficulty breathing, which required her to take up to four breathing treatments a day. (R. at 813-14, 849.) She stated that, in September 2018, she had surgery on her right shoulder to repair a rotator cuff tear. (R. at 814-15, 2133.) Hall stated she had arthritis in her hands and knees, and she continued to have shoulder pain issues. (R. at 816-17, 850.) She stated she had difficulty lifting objects, especially overhead. (R. at 816.) Hall stated she wore a brace to alleviate pain and to hold her left thumb in place, which rendered her unable to grip items. (R. at 817-19.) She stated that she experienced numbness and tingling in her right hand despite having two surgeries. (R. at 819, 845.) Hall stated she used a cane regularly due to constant back pain. (R. at 827, 846-47.) She stated she had bursitis in her hip following a fall in 2016. (R. at 843.)

---

[5] Hall's only dispute is with respect to the ALJ's assessment of her physical limitations. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 13-23.) Therefore, the court will address the facts relevant to Hall's physical residual functional capacity.

[6] Hall reported on her Disability Report that she completed the tenth grade. (R. at 273.)

In rendering his decision, the ALJ reviewed medical records from Dr. R.S. Kadian, M.D., a state agency physician; Dr. Bert Spetzler, M.D., a state agency physician; Norton Community Hospital; Haysi Clinic; University of Virginia Health Systems, ("UVA"); Pikeville Medical Center; Dr. D. Kevin Blackwell, D.O.; Highlands Neurosurgery, P.C.; and Shelby Valley Clinic.

From September 2011 through August 2012, Hall was treated by Dr. Suzanne Ford, D.O., a physician with Shelby Valley Clinic, for backache, not otherwise specified, and carpal tunnel syndrome. (R. at 585-95.) On examination, Hall had tight muscle band of the paravertebral muscles, bilaterally; and her right wrist joint exhibited no erythema, swelling, symmetry, atrophy or deformity, but painful range of motion. (R. at 587, 591.) On September 23, 2011, x-rays of Hall's lumbar spine were normal. (R. at 595.) On May 4, 2012, x-rays of Hall's right ankle and foot were normal. (R. at 593-94.)

From 2011 through 2013, Hall was seen at UVA for right carpal tunnel release,[7] thumb carpometacarpal, ("CMC"), joint infection; cervicalgia; spinal stenosis of the lumbar region without neurogenic claudication; backache, unspecified; and neuralgia, neuritis and radiculitis, unspecified. (R. at 342-61.) On November 14, 2011, an MRI of Hall's lumbar spine showed mild lower lumbar facet arthritis and generalized disc bulges causing mild bilateral neuroforaminal narrowing at the L3-L4 and L4-L5 levels. (R. at 359.) On June 18, 2012, Hall

---

[7] Hall had carpal tunnel surgery in 2010 and continued to complain of pain in her hand. In August 2011, she had revised carpal tunnel release surgery and continued to complain of pain, swelling and flexed fingers. (R. at 348, 548.) In June 2012 she was seen at Appalachian Physical Therapy & Sports Clinic for physical therapy due to joint stiffness and pain related to carpal tunnel syndrome. (R. at 548-52.) At that time, Hall complained of swelling in her hand, flexed fingers and thumb joint pain, numbness and tingling. (R. at 548.) She stated she had difficulty with everyday activities that required use of her right hand. (R. at 548.)

complained of decreased range of motion of the right thumb, index and middle fingers. (R. at 342.) She stated she experienced pinching that radiated up her arm and in her right wrist when she moved her hand. (R. at 342.) She also reported similar left wrist pain. (R. at 342.) Hall exhibited no evidence of erythema or drainage; she had brisk capillary refill; she had tenderness to palpation of the right CMC joint with positive grind; she had a mildly positive Tinel's sign at the wrist; her grip strength was 4+/5; and her sensation was slightly diminished in her thumb and index finger. (R. at 342.)

Throughout 2012 and 2013, Hall saw Malena Mullins, NP-C, a certified nurse practitioner with the Haysi Clinic, for back, knee, neck and shoulder pain; bilateral hand pain with numbness and tingling; osteoarthrosis; and hypertension. (R. at 371-23.) On November 26, 2012, x-rays of Hall's chest showed mild to moderate COPD, and left shoulder x-rays were normal. (R. at 404.) On June 29, 2013, an MRI of Hall's cervical spine showed mild degenerative changes, without significant spinal canal or neural foramina stenosis, and a small lesion along the posterior aspect of the right lobe of the thyroid gland. (R. at 353, 385.) That same day, an MRI of Hall's lumbar spine showed disc degenerative changes, with mild bilateral neural foraminal stenosis at the L3-L4 and L4-L5 levels, and multi-level facet arthropathy without significant interval changes. (R. at 355-56, 387-88.) On May 10, 2013, x-rays of Hall's right knee were normal. (R. at 602.) On September 14, 2013, an MRI of Hall's right knee was normal. (R. at 350.) In December 2013, Hall reported she felt very unstable due to low back and right knee pain, and she used a cane a times. (R. at 413.) She also reported her right elbow was "locking up;" she had difficulty turning her head; and she had right lower extremity weakness. (R. at 414.) Mullins referred Hall to UVA for right hand and right elbow

pain and instability and low back pain. (R. at 415.) During this time, examinations showed Hall's breathing was effortless and normal; auscultation of the lungs revealed clear breath sounds, bilaterally; her gait was normal; she exhibited swelling and tenderness of the distal interphalangeal, ("IP"), joints; she had restricted range of motion in the bilateral upper extremities, but no joint instability; and her motor examination revealed normal tone, bulk and strength. (R. at 372, 378, 382, 392, 399, 402, 408, 414-15, 419.)

On March 18, 2013, Hall was seen by Dr. Devesh Sharma, M.D., a physician at Pikeville Medical Center, reporting left hand pain aggravated by lifting. (R. at 364-68.) Hall reported she had two previous carpal tunnel surgeries that did not help her symptoms. (R. at 364.) She was given a thumb spica splint for basal joint arthritis of the thumb. (R. at 364.) On examination, Hall had pain with active range of motion; her grip strength was five pounds on the right and 30 pounds on the left; an elbow compression test elicited numbness in the radial digits; a Phalen's test was positive at 30 seconds; a median nerve compression test was positive; and her left wrist was negative for carpal tunnel or cubital tunnel syndrome. (R. at 367.) X-rays of Hall's hands were normal. (R. at 367.) Hall was diagnosed with limb pain and sensory problems with her limbs. (R. at 367.)

On April 30, 2014, D. Kevin Blackwell, D.O., examined Hall at the request of Disability Determination Services. (R. at 427-31.) Dr. Blackwell reported that Hall did not appear to be in any acute distress; she was alert, cooperative and fully oriented; she had a good mental status; she had no labored breathing, her inspiratory and expiratory effort was good, and her lungs were clear to auscultation; she had tenderness at the lumbar musculature and to the right side of

her neck; her gait was symmetrical and balanced; her shoulder and iliac crest
heights were good and equal bilaterally; her upper and lower joints had no
effusions or obvious deformities, they were normal in size, shape, symmetry and
strength; her grip strength was 5/5 and equal, bilaterally; her fine motor movement
and skill activities of the hands were normal; her reflexes in the upper and lower
extremities were good and equal, bilaterally; and she had intact proprioception. (R.
at 429-30.) Dr. Blackwell diagnosed multiple joint pains; bilateral knee pain; right
carpal tunnel syndrome by history; chronic cervicolumbar pain; osteoarthritis;
depression by history; and elevated blood pressure. (R. at 430.)

Dr. Blackwell opined that Hall could sit for up to eight hours in an eight-
hour workday; stand for up to two hours in an eight-hour workday, assuming
normal positional changes; she could perform bilateral above-head reaching
activities and operate foot pedal up to one-third of an eight-hour workday; she
should avoid repetitive and continuous stair climbing, crouching, crawling,
squatting and working at unprotected heights; she could kneel up to one-third of an
eight-hour workday; she could occasionally lift items weighing 30 pounds and
frequently lift items weighing 15 pounds; and no limitations were placed on Hall's
ability to perform fine motor movements and skill activities of the hands. (R. at
430.) Dr. Blackwell also found no visual, communicative, hearing or
environmental limitations. (R. at 430.)

On May 12, 2014, Dr. R.S. Kadian, M.D., a state agency physician, found
Hall had the residual functional capacity to lift and carry items weighing 20 pounds
occasionally and 10 pounds frequently; she could sit, stand and/or walk up to six
hours each in an eight-hour workday; push/pull as much as the lift/carry

restrictions; she had an unlimited ability to balance; and she could occasionally climb, stoop, kneel, crouch and crawl. (R. at 146-47.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 147.) On September 8, 2014, Dr. Bert Spetzler, M.D., a state agency physician, completed a medical assessment, which mirrored that of Dr. Kadian. (R. at 162-63.)

On June 4, 2014, Hall was seen at UVA for evaluation of neck and low back pain. (R. at 436-46.) She stated her neck pain radiated into her left arm, hand and fingers, causing numbness, and her back pain radiated into her left leg and toes, causing a burning sensation. (R. at 436.) Hall's gait was stable with no signs of ataxia; her cervical, thoracic and lumbar spine had normal range of motion with no tenderness; her upper extremities had normal range of motion, bilaterally, intact sensation, 2+ symmetric reflexes and negative shoulder abduction sign; and her lower extremities had intact sensation and negative straight leg raising tests. (R. at 438.) X-rays of Hall's cervical spine showed no significant degenerative change, and x-rays of her lumbar spine showed minimal disc height loss at the L3-L4 level. (R. at 438, 442, 444.) Hall was diagnosed with cervical degenerative disc disease; cervical pain; cervical radicular pain; lumbar degenerative disc disease; lumbosacral radicular pain; and tobacco cessation. (R. at 438-39.)

On July 10, 2014, Hall underwent sensory nerve conduction studies and a needle EMG examination at UVA, which showed no electrophysiologic evidence of active cervical or lumbar radiculopathy; left carpal tunnel syndrome, evidenced by mild median nerve electrophysiologic dysfunction; and no evidence of focal ulnar neuropathy or generalized peripheral neuropathy. (R. at 480-81.) An MRI of Hall's cervical spine showed small circumferential disc bulges, without evidence

of spinal canal or neural foraminal stenosis, and an MRI of her lumbar spine showed mild degenerative changes, most notable at the L3-L4 and L4-L5 levels, with mild, bilateral foraminal stenosis. (R. at 484.) Her examination remained unchanged from her June 4, 2014, visit. (R. at 483-84.) On August 4, 2014, Hall complained of left hand pain and paresthesias and bilateral shoulder pain, right greater than left. (R. at 486, 488.) She stated her shoulder pain was worse with overhead reaching and reaching to the side. (R. at 488.) Hall's left hand/wrist had negative Tinel's sign; she had a positive median nerve compression test;[8] her grip strength was 4/5; she had diminished sensation in radial digits; she had brisk capillary refill; and right hand's incision was well-healed; and she was able to make a full fist. (R. at 487.) A wrist carpal tunnel injection was administered, and Hall was given a prescription for a wrist brace and a home exercise program. (R. at 487, 491.) X-rays of Hall's shoulders showed no bony abnormality. (R. at 490.) Hall was diagnosed with right greater than left shoulder impingement, possible rotator cuff tear. (R. at 490.) An MRI with arthrogram of the right shoulder was ordered. (R. at 490.)

On August 26, 2014, Hall was seen at UVA, and upon examination, her cervical spine had limited range of motion and tenderness to palpation over the cervical paraspinals with trigger points; her upper extremity reflexes were 2+ and symmetric with negative Hoffman's, bilaterally, with intact sensation to light touch; she had limited range of motion of the lumbar spine; she had negative straight leg raising tests; her bilateral lower extremities had intact sensation to light

---

[8] Median compression test is a diagnostic test for carpal tunnel syndrome. The patient's forearm is supinated and then the examiner applies direct pressure over the median nerve for 30 seconds. A positive test indicates any numbness, pain or paresthesia in the distribution of the median nerve. *See* https://www.physio-pedia.com/Carpal_Compression_Test (last visited Nov. 16, 2023).

touch with 2+ symmetric reflexes. (R. at 494-95.) Hall was diagnosed with cervical degenerative disc disease and lumbar degenerative disease. (R. at 495.) That same day, an MRI of Hall's right shoulder showed a rotator cuff tear and a right lung nodule. (R. at 498-99, 503, 516-20.) It was explained that treatment of Hall's lung took priority over the rotator cuff tear. (R. at 499.) On September 23, 2014, Hall complained of right shoulder pain with some radiation into the deltoid area, but not past the elbow. (R. at 2098.) She denied associated neck pain, arm pain, numbness and tingling. (R. at 2098.) Hall was diagnosed with a rotator cuff tear. (R. at 2101.) It was noted that Hall's shoulder pain did not limit her activity. (R. at 2104.)

On November 6, 2014, Hall was seen at UVA, and examinations showed she had no wheezes, rales or rhonchi; her musculoskeletal system had normal range of motion; and she had no lower extremity edema. (R. at 502.) Pulmonary function tests showed moderately severe obstructive lung disease and air trapping with reduced diffusing capacity of the lungs for carbon monoxide. (R. at 502-04.) A lung biopsy showed poorly differentiated adenocarcinoma of the right upper lobe. (R. at 695-96.) Following her diagnosis of lung cancer, in December 2014, Hall underwent a thoracoscopic right upper lobectomy with chest wall resection. (R. at 631-65.) Hall continued to smoke and had enlarging left upper lobe nodule with no evidence of any hilar mediastinal or systemic disease, and, in August 2015, she underwent a flexible bronchoscopy; thoracoscopic left upper lobe wedge resection; mediastinal lymph node sampling; and intercostal nerve block for a definitive diagnosis and resection. (R. at 599-600, 665-86.) Hall was diagnosed with a well-differentiated adenocarcionoma and emphysema. (R. at 599, 681, 753.) Hall did well following surgery, but reported persistent shortness of breath and stated she continued to smoke. (R. at 2364.)

During 2014 and 2015, Hall saw Mullins, reporting right shoulder pain, right foot pain and numbness in her left wrist. (R. at 451-73, 526-47, 563-77, 2381-97.) Hall denied back pain, limitation of movement and muscle pain and weakness. (R. at 452, 465, 471, 530, 534, 538, 2382.) In March 2014, Hall reported back pain; numbness in both arms; neck pain with difficulty turning her head; her right elbow was "locking up;" and right lower extremity weakness. (R. at 462.) She stated that she used a cane at times because she felt very unstable. (R. at 461.) In April 2014, Hall reported right foot pain and difficulty walking on it. (R. at 457.) X-rays of Hall's right foot and ankle showed no abnormalities. (R. at 456.) Hall's right lower extremity had marked tenderness to palpation; she had an ingrown toenail; she had discomfort with range of motion; and she had no joint instability. (R. at 458.) Hall's toenail was excised. (R. at 458.) Otherwise, during this time, Hall's examinations revealed her breathing was effortless and normal with clear breath sounds, bilaterally; her gait was normal; inspection and palpation of the digits were normal; and she had normal muscle tone, bulk and strength. (R. at 462-63, 466, 472, 527, 531, 535, 539, 543, 546, 565, 569, 573, 577, 606, 608, 612, 2383.) In June and October 2015, chest x-rays showed COPD. (R. at 525, 601.)

In April 2016, Hall was seen at UVA, reporting she felt well despite occasional right shoulder pain and headaches. (R. at 2365.) A CT scan of Hall's chest showed no signs of recurrence or metastatic disease, but mild upper lobe predominant centrilobular emphysema and findings consistent with smoking-related respiratory bronchiolitis. (R. at 2367.)

Throughout 2016, Hall saw Mullins, reporting shortness of breath; right cervical spine pain and muscle spasms; inability to use her right upper extremity

due to right shoulder pain; and left hip pain. (R. at 25-31, 65-85, 2398-2438.) She denied back pain, joint stiffness, limitation of joint movement and muscle pain and weakness. (R. at 2404, 2408, 2412, 2416, 2420, 2432.) On September 7, 2016, Hall reported her breathing was doing well, but she had to watch her activity because simple tasks caused her to get out of breath. (R. at 28.) Hall's examination findings showed her breathing was effortless and normal; auscultation of the lungs revealed clear breath sounds, bilaterally; her gait was normal; and her motor examination revealed normal muscle tone, bulk and strength. (R. at 30, 70, 75, 79, 83, 2405, 2409, 2413, 2417, 2421, 2432-33.) Mullins opined that Hall was permanently disabled due to limited lung capacity. (R. at 30.) On September 26, 2016, Hall saw Mullins, reporting left hip pain after falling in her driveway. (R. at 25-27.) Hall ambulated with crutches; her left lower extremity had mild swelling; she had marked tenderness to palpation at the bilateral hip joints; she had very limited range of motion; and her left lower extremity had no joint instability. (R. at 25-26.) X-rays revealed a superior ramus fracture. (R. at 26.) Hall was diagnosed with a pelvis fracture and nicotine dependence. (R. at 26.) In November 2016, Hall reported dizziness and hypertension.[9] (R. at 2431.)

On November 2, 2016, Hall presented to the emergency department at Norton Community Hospital, reporting elevated blood pressure and dizziness. (R. at 17-23.) A CT scan of Hall's head showed no acute intracranial abnormality. (R. at 21.) Chest x-rays demonstrated COPD, without an acute cardiopulmonary

---

[9] Hall continued to complain of dizziness and high blood pressure in February 2017. (R. at 2439.) Her examination findings remained unchanged. (R. at 2441, 2462, 2468.) In March 2017, Hall reported she felt much better after receiving a Rocephin injection, stating her back and hip felt "much better." (R. at 2444.) However, in May 2017, Hall complained of left hip pain and tenderness. (R. at 2459.) In June 2017, she reported her low back and shoulder pain was relieved with Percocet, but she had difficulty lying on her right side due to pain. (R. at 2465.)

process. (R. at 23.) Hall was diagnosed with nystagmus, likely peripheral; sinus congestion; and urinary tract symptoms. (R. at 18, 20.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2022). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2022).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Hall argues that substantial evidence does not exist to support the ALJ's finding that she was not disabled. (Plaintiff's Brief at 13-23.) In particular, Hall argues the ALJ erred in his evaluation of the borderline age assessment. (Plaintiff's Brief at 15-17.) Hall also argues that the ALJ erred by failing to properly consider her right shoulder and hip impairments. (Plaintiff's Brief at 17-21.) Hall argues the ALJ failed to properly assess the prior ALJ's September 20, 2012, decision. (Plaintiff's Brief at 21-23.) Specifically, Hall contends the ALJ erred by finding she could frequently feel and finger, rather than occasionally, as found by the ALJ in September 2012. (Plaintiff's Brief at 21-22.)

I first will address Hall's argument regarding her borderline age. As noted above, the burden rests with the Commissioner at step five of the sequential process to prove by a preponderance of the evidence that the claimant can perform other work that exists in significant numbers in the national economy, considering the claimant's residual functional capacity, age, education and work experience. The Commissioner can meet her burden at step five by referencing the Medical-

Vocational Guidelines, ("the Grids"), found at 20 C.F.R. Part 404, Subpart P, Appendix 2. The Grids contain four age categories: (1) younger person (under age 50); (2) person closely approaching advanced age (age 50-54); person of advanced age (age 55 or older); and (4) person closely approaching retirement age (age 60 or older). *See* 20 C.F.R. § 404.1563 (2022). "An ALJ must consider a claimant's age category from the alleged disability onset date until the date the ALJ announced his decision." *Brown v. Colvin,* 2014 WL 1658751, at *3 (W.D. N.C. Apr. 25, 2014) (citations omitted). In situations where the claimant's age is on the borderline of the higher age category, the Commissioner does not apply the age categories mechanically and may apply the higher category. *See* 20 C.F.R. § 404.1563(b); *see also Pickett v. Astrue*, 895 F. Supp. 2d 720, 724 (E.D. Va. 2012). As the regulations explain:

> If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

20 C.F.R. § 404.1563(b). Thus, in borderline age situations, the ALJ must decide whether to apply the higher age category or the claimant's actual age category. *See* 20 C.F.R. § 404.1563(b). The Social Security Administration, through the Hearings, Appeals, and Litigation Law Manual, ("HALLEX"),[10] at Section I-2-2-42, offers guidance for determining whether a borderline age situation exists. To identify borderline age situations when making disability determinations, adjudicators are to apply a two-part test: (1) determine whether the claimant's age is within a few days or a few months of the next higher age category; and (2)

---

[10] HALLEX is available at http://www.ssa.gov/OP_Home/hallex.

determine whether the higher age category would result in a finding of "disabled" instead of "not disabled." If the answer to both questions is "yes," a borderline age situation exists, and the ALJ must decide whether it is more appropriate to use the higher age category or the claimant's chronological age. *See* HALLEX I-2-2-42; *see also Yates v. Colvin*, 2015 WL 5158739, at \*7 (W.D. Va. Sept. 2, 2015). In addition, HALLEX I-2-2-42 requires that the ALJ explain in the decision that he considered the borderline age situation, state whether he applied the higher age category or the chronological age and note the specific factors he considered.

The ALJ in this case stated Hall's birthday in the decision and noted that she turned 50 years old almost two months after the date last insured of September 30, 2016. (R. at 793.) Prior to Hall's date last insured, she remained a younger person. The ALJ found that Hall's past work was semi-skilled and that she did not have any mental limitations that reduced her to unskilled work. (R. at 793.) The ALJ acknowledged that Hall's limited education did not come close to "illiteracy, and again, she has semi-skilled work in her history, indicating her actual cognitive ability is substantial." (R. at 793.) The ALJ added that Hall had the residual functional capacity to perform sedentary work, and her nonexertional limitations did not greatly erode the sedentary base. (R. at 793.) The ALJ did not simply mechanically apply the Grid Rules when Hall was a younger person. At the hearing, the ALJ asked the vocational expert a hypothetical question that captured Hall's functional limitations. The vocational expert responded that such an individual could perform sedentary work. Therefore, the ALJ found that a significant number of jobs existed that Hall could perform. Thus, the ALJ found the evidence did not support nonmechanical use of the Grids. (R. at 794.) Based on

this, I find the ALJ properly explained in the decision that he considered the borderline age situation, stated that he applied Hall's chronological age, and he noted the specific factors he considered.

Hall argues the ALJ failed to properly consider her right shoulder and hip impairments. (Plaintiff's Brief at 17-21.) Concerning Hall's shoulder issues, the ALJ noted her complaints of shoulder pain in April 2016, but stated that the record did not show complaints of right shoulder pain during the period at issue or in the few months subsequent. (R. at 790.) He did, however, note Hall's complaint of pain with reaching overhead and accommodated this with limiting her to occasionally reaching overhead, but found she could frequently reach in all other directions. (R. at 790.) However, a review of the record shows Hall complained of shoulder pain as early as 2013 and continued to do so after her date last insured. Hall underwent right shoulder arthroscopy with rotator cuff repair in September 2018. (R. at 1973.) In July 2013, Hall had restricted range of motion of the bilateral upper extremities. Throughout 2015, Hall repeatedly complained of right shoulder pain. In August 2016, Hall complained of pain with overhead reaching and reaching to the side. She had tenderness to palpation over the cervical paraspinals with trigger points, and an MRI showed a rotator cuff tear. Hall continued to report that she was not able to use her right upper extremity due to pain, joint stiffness, limitation of joint movement and muscle pain and weakness through 2016. Based on this, I do not find that substantial evidence exists to support the ALJ's finding that Hall could occasionally reach overhead and frequently reach in all directions.

In addition, Hall contends the ALJ erred by failing to properly address the prior ALJ's September 20, 2012, decision, wherein the ALJ limited her to only

occasional feeling and fingering with the dominant upper extremity. (Plaintiff's Brief at 21-23.)   The ALJ noted that the September 2012 decision was given little weight, as Hall's condition had changed, and there were new impairments, which warranted a sedentary level of exertion. (R. at 792.) Specifically, the ALJ found that the evidence assembled in this case depicts greater limitations than that found in the prior ALJ's decision due to new and material evidence, including cervical and lumbar degenerative disc disease, COPD, lung cancer and arthritis. (R. at 792.) The ALJ in this case limited Hall to frequent feeling and fingering due to carpal tunnel syndrome and arthritis. (R. at 784.) The ALJ, however, failed to address any support for functional improvement in this area.

The difference between occasional and frequent feeling and fingering is pivotal in Hall's claim, as the jobs identified and used by the ALJ to deny her claim at step five of the sequential evaluation would be eliminated should she be limited to occasional fingering and feeling. The record shows that Hall has undergone two right carpal tunnel surgeries, which she states were unsuccessful. The record shows that in March 2013, Hall's right hand grip strength was five pounds, and her left hand grip strength was 30 pounds. She had positive elbow compression test, Phalen's test and median nerve compression test. She was diagnosed with limb pain and sensory problems with the limbs. In August 2011, Hall was diagnosed with right thumb CMC arthritis, and she was later given a thumb spica splint for basal joint arthritis of the thumb. She testified at her hearing that she wore a brace to hold her thumb in place and to alleviate the pain, which rendered her unable to grip items. In September 2014, Hall complained of no relief from a left hand injection and brace being placed on the left wrist due to carpal tunnel.

It is well-settled that, in determining whether substantial evidence supports the ALJ's decision, the court must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "The courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Based on the above, I do not find that substantial evidence exists to support the ALJ's finding regarding Hall's residual functional capacity. Based on these findings, I will not address Hall's remaining arguments.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist to support the ALJ's weighing of the medical evidence;

2.  Substantial evidence does not exist in the record to support the ALJ's residual functional capacity; and

3.  Substantial evidence does not exist in the record to support the Commissioner's finding that Hall was not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Hall's motion for summary judgment; deny the Commissioner's motion for summary judgment; vacate the Commissioner's decision denying benefits; and remand the case to the Commissioner for further consideration.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    November 20, 2023.

s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE